UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| O CORP CORPORATION (f/k/a ORECK CORPORATION) and O MERCHANDISING, LLC (f/k/a ORECK MERCHANDISING, LLC) | ) ) ) ) ) | |
| Appellants, | ) ) | Civil No. 3:14-CV-01061 Judge Aleta A. Trauger |
| v. | ) ) | |
| ROYAL APPLIANCE MANUFACTURING CO. and OAC ACQUISITION COMPANY, LLC, | ) ) ) ) | |
| Appellees. | ) | |

**MEMORANDUM AND ORDER**

On March 5, 2014, the Bankruptcy Court signed an Order granting the Cross-Motion for Summary Judgment of Royal Appliance Manufacturing Co. ("Royal") and OAC Acquisition Company, LLC ("OAC") (together, "Appellees") in Bankruptcy Case No. 13-04006, Adv. Proc. No. 13-ap-90482. The Bankruptcy Court concluded that there was no dispute of material fact and that Appellees, as opposed to debtors O Corp Corporation ("O Corp") and O Merchandising, LLC ("O Merchandising") (together, "Appellants"), were entitled to judgment as a matter of law granting them ownership of certain merchandise returned by QVC, Inc.

Appellants have filed the instant appeal (Docket No. 1), and the accompanying record (Docket No. 2) and brief (Docket No. 7), to which the Appellees have filed a Response (Docket No. 11), and the Appellants have filed a Reply (Docket No. 18). The Appellees have filed a Sur-Reply (Docket No. 19), to which the Appellants have filed a Reply (Docket No. 22).

1

This matter is before this court on appeal pursuant to 28 U.S.C. § 158(a).

**I.      Background and Procedural History**

Prior to entering bankruptcy, the Appellants manufactured and sold vacuums and related products under the "Oreck" brand name.[1] QVC, Inc. ("QVC") was one of the Appellants' major customers. QVC purchased products from the Appellants and then resold those products by means of home shopping events that were broadcast on QVC's television network. The purchase orders between Appellants and QVC were denoted as "sale or return" transactions, pursuant to the Uniform Commercial Code ("UCC") and similar Pennsylvania law. Under such transactions, QVC was allowed to return (1) unsold merchandise and (2) customer-returned merchandise (*i.e.*, merchandise sold by QVC but subsequently returned to QVC by the purchaser) to the Appellants for either a return of cash or a credit on future purchases. In practice, this arrangement allowed QVC to purchase a large amount of merchandise, sell as much of that merchandise as possible during televised events, and then return the remaining merchandise for the equivalent of a partial refund. QVC typically paid the Appellants for purchased merchandise within a few days of delivery.

The Appellants declared bankruptcy on May 6, 2013. Prior to that date, QVC issued two purchase orders to the Appellants to obtain products for a televised home shopping event that was scheduled to be broadcast on July 28, 2013 ("QVC Event"). Purchase Order No. 763707 was for 31,800 Oreck Axis vacuum cleaners, and Purchase Order No. 763964 was for 128,000 Oreck upright inner vacuum bags (together, the "Merchandise"). Both purchase orders denoted the

---

[1] Unless otherwise noted, capitalized terms herein have the same meaning as in the final asset purchase agreement dated July 24, 2013 ("Final APA").

usual "sale or return" transactions. The Appellants obtained and utilized post-petition financing to manufacture and ship the Merchandise. The Appellants shipped all of the Merchandise to QVC by July 3, 2013.

On June 20, 2013, the Bankruptcy Court set the procedures for an auction and sale of substantially all of the Appellants' assets. The auction was a sale of the Appellants' business as a going concern.[2] The "stalking horse bidder" selected by the Appellants had submitted a draft asset purchase agreement ("Original Stalking Horse APA"). The Original Stalking Horse APA contained no provisions specifically related to QVC. QVC objected because it was concerned about the level of protection offered by the general assumption of liability provisions. On June 19, 2013, the stalking horse added a new Section 1.4(e) ("Amended Stalking Horse APA"), which provided that the stalking horse would assume all of the Appellants' obligations to QVC, with no dollar limit. Pursuant to procedures established by the Bankruptcy Court, the Amended Stalking Horse APA became the form of asset purchase agreement upon which other prospective purchasers were required to base their bids.

Also on June 20, 2013, the Appellants, QVC, and the stalking horse agreed to amend the terms of the outstanding purchase orders ("QVC Settlement") to increase the payment reserve from zero to forty percent. As part of the QVC Settlement, those parties also (1) reaffirmed that the purchaser of the Appellants' assets would assume all of the Appellants' obligations under the purchase orders, including the obligations for returns and warranties, and (2) agreed to require that the Appellants purchase infringement and recall insurance before QVC made any payment to the Appellants for the Merchandise. Delays in meeting these additional conditions excused QVC

---

[2] This is expressly reflected in Section 7.4 of the Final APA.

from making any payment for the Merchandise until late November 2013.

Thereafter, the Appellees submitted their own draft bid ("July 1 APA"), which borrowed substantially from the Amended Stalking Horse APA. Section 1.1 of the July 1 APA stated that the Appellees were purchasing, *inter alia*, ". . . all of the assets utilized by the Sellers in or relating to the Business . . . including all of the Sellers' right, title, and interest in, to and under any and all physical and/or technology-based assets, properties and right of the Sellers of every kind, nature and description, real, personal or mixed, tangible or intangible, known or unknown, wherever located . . . ," and that "the Sellers expressly agree that the sale of the Purchased Assets constitutes a transfer of all of the Sellers' right, title and interest with respect to the Purchased Assets . . . ." Section 1.1(q) stated that the Purchased Assets include all assets which are not Excluded Assets, including "all other assets owned or controlled by the Sellers or their Affiliates necessary, appropriate, or desirable to operate the Business as [it] is being currently conducted."

The July 1 APA exempted certain specific assets – the "Excluded Assets" – from the "Purchased Assets" to be sold by the Appellants. Section 1.3(a) excluded cash and cash equivalents owned by the Appellants at closing. Section 1.4(b) excluded the Appellants' "Contract[s]," which were separately defined by the July 1 APA as "any agreement, contract, lease, consensual obligation, promise or undertaking (whether written or oral and whether express or implied), whether or not legally binding." By means of Section 1.4(e), the Appellees agreed to include the assumption of liabilities to QVC. The Appellees also agreed to the terms of the QVC Settlement, which was ultimately included in the Final APA as Schedule 1.3(n).

The Appellants' sale auction occurred on July 8, 2013. The Appellees outbid the stalking horse bidder by over four million dollars, with a final winning bid of $17,250,000. By that time,

however, QVC had yet to pay for or return the Merchandise, and it became clear to the parties that payment would not be received from QVC by the date of the Closing.  In preparing the Final APA, the Appellants began utilizing calculations that excluded the money owed by QVC for the Merchandise ("QVC Cash Receivables") from Purchased Assets.  The Appellants informed the Appellees that the stalking horse bidder had agreed to exclude the QVC Cash Receivables, but the Appellants conceded that this may not have been adequately conveyed to the Appellees as part of the auction process.  Nevertheless, the Appellants requested that the Appellees agree to modify the July 1 APA, by adding Section 1.3(n), so that the QVC Cash Receivables would be an Excluded Asset (rather than one of the Accounts Receivable which was a Purchased Asset).  The Appellees agreed to do so.  No provision was added concerning any returned Merchandise.

Around the same time, the Appellants provided a Working Capital Statement to Royal pursuant to Section 6.1 of the Final APA.  The Working Capital Statement did not include the value of the Merchandise.  Appellees did not question the contents of the Working Capital Statement.

The Bankruptcy Court approved the Final APA on July 22, 2013.  The Final APA included Sections 1.1, 1.1(q), 1.3(a), 1.4(b), 1.4(e) and Schedule 1.3(n) from the July 1 APA.  On July 24, 2013, the parties executed the Final APA and closed the sale ("Closing").

On July 28, 2013, QVC held the QVC Event and sold approximately half of the Merchandise.  On August 9, 2013, QVC notified the parties that it was commencing returns of (1) unsold Merchandise and (2) Merchandise sold at the QVC Event but subsequently returned by the purchasers to QVC (together, "QVC Returned Merchandise").  The QVC Returned Merchandise consisted of over 17,000 Oreck Axis vacuum cleaners and 67,000 Oreck vacuum cleaner bags.  Royal responded to QVC and the Appellants and informed them that Royal would

pick up the QVC Returned Merchandise. On September 5, 2013, the Appellants responded and asserted claims to the QVC Returned Merchandise.

In conjunction with the return of the QVC Returned Merchandise, QVC filed two proofs of claim in the Appellants' bankruptcy case as a set-off against unpaid invoice amounts that remained owing to the Appellants ("QVC Claims"). Claim No. 12, for the unsold Merchandise, was in the amount of $2,329,162.55. Claim No. 15-2, for the customer-returned Merchandise, was in the amount of $211,091.74.

On November 22, 2013, QVC paid the Appellants $2,212,746.70 for the Merchandise that QVC kept and sold at the QVC Event (and was not returned by purchasers).

On December 24, 2013, the Appellees filed a Complaint for Declaratory Relief seeking a ruling from the Bankruptcy Court that the Returned Merchandise belongs solely to them and that the Appellees do not owe the Appellants any further payment on account of the QVC Returned Merchandise. (Adv. Proc. Docket No. 1.) On December 31, 2013, the Appellants filed a Motion for Summary Judgment, requesting that the Bankruptcy Court deny the relief sought by the Appellees and enter an order requiring the Appellees to turn over all of the QVC Returned Merchandise to the Appellants. (Adv. Proc. Docket No. 5.) On January 24, 2014, the Appellees filed (1) their Objection to the Appellants' Motion for Summary Judgment and (2) a Cross-Motion for Summary Judgment. (Adv. Proc. Docket Nos. 17, 18.) The Bankruptcy Court held oral argument on February 18, 2014, and issued a ruling from the bench denying the Appellants' Motion for Summary Judgment and granting the Appellees' Cross-Motion for Summary Judgment. The Bankruptcy Court entered its order on March 5, 2014, and the Appellants filed a timely notice of appeal under Federal Rule of Bankruptcy Procedure 8002(a) on March 17, 2014.

**II.** **Standard of Review**

A district court reviews a bankruptcy court's grant of summary judgment, which is a final order, *de novo*. *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). *De novo* review means that this court makes legal determinations independent of the trial court's determinations. *In re Periandri*, 266 B.R. 651, 653 (B.A.P. 6th Cir. 2001) (quoting *Corzin v. Fordu (In re Fordu)*, 209 B.R. 854, 857 (B.A.P. 6th Cir. 1997)). No deference is given to the trial court's conclusions of law. *Booher Enters. v. Eastown Auto Co. (In re Eastown Auto Co.)*, 215 B.R. 960, 964 (B.A.P. 6th Cir. 1998) (citation omitted).

The Federal Rules require the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue

of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

A threshold question before the court on appeal is thus whether there is any dispute of material fact which precludes Appellees from receiving the judgment as a matter of law that was granted below.

### III.    Discussion

One of the core issues in this dispute is the meaning of Final APA Section 1.3(b), which defines as an Excluded Asset "any Contract or Lease other than the Assigned Agreements as provided in Section 5.6, including, without limitation, all severance agreements entered into by the Sellers." (Docket No. 11 at A-3.) The Appellants maintain that the term "Contracts" in this context broadly encompasses both non-executory (such as the QVC sale or return purchase orders) contracts and executory contracts. (*See* Docket No. 7 at 17-18.) Despite this argument, the Appellants concede that certain of their contracts were Purchased Assets pursuant to other provisions of the Final APA. (*Id.*) The Appellants contend that "the intent of the parties" is of "critical importance" in understanding the meaning of "Contracts" in Section 1.3(b). (*Id.*) As evidence of the Appellants' intent to exclude the QVC sale or return purchase orders under Section 1.3(b), the Appellants rely upon, *inter alia*, (1) the negotiations of the parties, (2) the drafting of other Final APA sections, (3) the Working Capital Statement produced by the Appellants and accepted by the Appellees, under Final APA Section 6.1, and (4) the Appellants' reasons for manufacturing the Merchandise (*i.e.*, to receive the full benefit of its value to fund the administrative costs of bankruptcy). (*Id*. at 6, 17-18; Docket No. 18 at 1-3, 8-11; Docket No. 22 at 3-4.)

The Appellees, on the other hand, maintain that the meaning of "Contracts" in Section 1.3(b) is limited to executory contracts and that any other conclusion would effectively nullify the sale of any asset of the Appellants that had been obtained pursuant to contract. (Docket No. 11 at 21.) The Appellees contend that their understanding of the auction of the Appellants was that Section 1.3(b) had not been drafted to include the QVC sale or return contracts (which had been executed by the Appellants). (*Id*. at 22.) As evidence, the Appellees rely upon (1) the negotiations of the parties, (2) the intent of the parties regarding the drafting of numerous other Final APA provisions concerning Purchased Assets, (3) a specific, different understanding of the purpose and content of the Working Capital Statement, (4) the negotiation and content of the Original Stalking Horse APA versus the Final APA, and (5) standards employed in the routine practice of bankruptcy law. (*Id*. at 22-24, 29-30; Docket No. 19 at 1-5.)

The Final APA expressly provides that it is governed by Delaware law. The issues surrounding Section 1.3(b) concern the proper interpretation of the Final APA. The court must therefore consider the rules of contract interpretation under Delaware law. Under Delaware law, when an issue is one of contractual interpretation, the role of a court is to effectuate the parties' intent, taking the contract as a whole and giving effect to each and every term. If the language of the agreement is "clear and unambiguous," the reviewing court finds the parties' intent in the ordinary and usual meaning of the words they have chosen. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). If, however, the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). Where there is ambiguity, a court must ascertain the parties' intent by looking beyond the

9

language of the contract to extrinsic evidence, such as overt statements and acts of the parties, the business context, prior dealings between the parties, and business custom and usage in the industry.[3] *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, Civil Action No. 3369-VCP, 2009 WL 3161643, at *6 (Del. Ch. Sept. 30, 2009). In this situation, extrinsic evidence that is otherwise immaterial may become material, and contested extrinsic evidence may become a dispute of material fact that precludes summary judgment.

The parties stipulated to a number of facts before the Bankruptcy Court. However, they argued for considerably different meanings of Section 1.3(b). Although the Bankruptcy Judge heard argument that illustrated the parties' opposing viewpoints as to the intent and purpose of Section 1.3(b) regarding executory versus non-executory contracts (Docket No. 3 at 51-53), he nonetheless concluded that there were "no disputed facts" and concluded that the Final APA is only subject to one interpretation. (Docket No. 3 at 66). On appeal, the parties have likewise operated upon the dual assumptions that there are no disputed facts and that the standard for summary judgment has been met. It further appears that the parties have assumed that Section 1.3(b) is not ambiguous. However, on *de novo* review, this court is required to independently consider these questions.

The parties have briefed extended arguments for different interpretations of Section 1.3(b) and have premised those arguments, at least in part, on the intent of the parties and other

---

[3] A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. *Lorillard*, 903 A.2d at 739. The court's inquiry is into how the parties outwardly manifested their intention, not into an inner, subjective intention. *SBC Interactive, Inc. v. Corporate Media Partners*, No. Civ.A. 15987, 1997 WL 810008, *4 n.13 (Del. Ch. Dec. 29, 1997).

evidence. Put simply, the parties contend flatly different meanings for the same contractual provision. If the term "Contracts" in the context of Section 1.3(b) is legitimately susceptible to different interpretations or meanings, it may be ambiguous under Delaware law. If such is the case, the court may need to look beyond the language of the contract to ascertain the parties' intentions. At a minimum, it appears to the court that the parties may differ as to evidence concerning (1) the purpose of the QVC transactions and the need to safeguard the proceeds thereof, (2) the negotiation of the Final APA *vis a vis* the QVC Merchandise, and (3) the Working Capital Statement – each of which may speak to the intent behind Section 1.3(b).

The court will therefore order additional briefing on the following issues:

(1) Is Section 1.3(b) ambiguous under Delaware law of contractual interpretation?

(2) Assuming, *arguendo*, that it is ambiguous, what specific evidence establishes the intent of either party regarding the meaning of Section 1.3(b)?

(3) Is any such evidence disputed or undisputed?

(4) How and why are any such disputes of fact sufficient or insufficient to defeat summary judgment?

The Appellants' brief shall be filed by January 26, 2015. The Appellees brief shall be filed by February 9, 2015. The briefs shall not exceed 15 pages in length.

IT IS SO ORDERED.

Enter this 14th day of January, 2015.

_____
ALETA A. TRAUGER
United States District Judge